NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

IN RE TERMINATION OF PARENTAL RIGHTS AS TO J.W.

No. 1 CA-JV 26-0013

FILED 07-20-2026

---

Appeal from the Superior Court in Maricopa County
No. JD41028
The Honorable Keith A. Miller, Judge

**AFFIRMED**

---

COUNSEL

Maricopa County Legal Defender, Phoenix
By Jamie R. Heller
*Counsel for Appellant*

Deputy Legal Advocate, Phoenix
By Amanda L. Adams
*Counsel for Appellee J.W.*

Arizona Attorney General's Office, Tucson
By Jennifer L. Thorson
*Counsel for Appellee DCS*

David W. Bell, Mesa
*GAL for Appellee J.W.*

---

**MEMORANDUM DECISION**

---

Judge Jennifer M. Perkins delivered the decision of the Court, in which Presiding Judge Michael S. Catlett and Judge Angela K. Paton joined.

---

**P E R K I N S**, Judge:

**¶1**        Gina Carter ("Mother") appeals the juvenile court's order terminating her parental rights to Jayce (a pseudonym). The same order terminated the parental rights of Jayce's biological father, but he is not a party to this appeal. For the following reasons, we affirm.

### FACTS AND PROCEDURAL BACKGROUND

**¶2**        We view the facts in the light most favorable to sustaining the juvenile court's order. *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 2, ¶ 2 (2016).

**¶3**        Jayce was born substance-exposed to THC in 2012 and suffers from severe, non-verbal autism. In June 2021, the Department of Child Safety ("DCS") removed Jayce from Mother's care after Jayce was found wandering the streets alone and naked. At the time of removal, Mother was staying in a motel room where law enforcement found drug paraphernalia. June 2021 was the last time Mother had contact with Jayce until September 2024.

**¶4**        In September 2021, the juvenile court placed Jayce with the estranged-since-2017 biological father and granted Mother parenting time. In February 2022, the father returned Jayce to DCS custody, claiming he could no longer meet Jayce's needs and ceasing all contact with Jayce and DCS. DCS placed Jayce in foster care and opened a dependency case against both parents.

**¶5**        From June 2021 to September 2024, DCS made numerous attempts to locate and serve Mother at her last known addresses, as well as to reach her via phone and social media. Eventually, the court ordered service by publication. Mother did not contact DCS or her appointed counsel until September 2024.

**¶6**        Once Mother established contact, DCS offered her a variety of reunification services, including Nurturing Parent Program ("NPP") parenting classes, which she completed with accolades between November

2024 and February 2025. Mother successfully completed three out of six scheduled visits with the service provider case aide, cancelling the other three. Because Mother had transportation issues, DCS assessed her home and approved supervised in-home parental visits with Jayce in December 2024.

¶7            The record suggests that for various reasons Mother successfully completed only three parental visits with Jayce. According to her then-current service provider, Mother canceled two consecutive visits in December 2024 because she had not received confirmation of DCS-provided transportation and a third visit after notifying the DCS case aide that she was unavailable. After that, Mother was unable to visit with Jayce for multiple weeks due to a misunderstanding within DCS regarding whether Mother was approved for in-home visitation.

¶8            Mother had a successful in-home visit in January 2025, at which she showed good parenting skills, and Jayce kept coming back to kiss her. There were no more visits because Jayce went on vacation for two weeks with the foster placement, and the DCS case aide fell ill. Then Mother's referral was closed for non-visitation in early February 2025, in part because the service provider failed to set a reminder to extend it. It appears that in early February 2025, Mother reported to NPP that she had issues completing parenting visits due to transportation, the DCS case manager turnover, and the foster placement.

¶9            In February 2025, DCS lost contact with Mother again. In April 2025, Jayce's maternal aunt in California expressed an interest in adopting Jayce. Mother participated in a Foster Care Review Board meeting in June 2025, during which she provided DCS with an updated phone number and confirmed her email address, but soon stopped responding again. In August 2025, DCS moved to change the dependency plan from reunification to termination and adoption due to abandonment and 15 months out-of-home placement. The court granted the motion over Mother's objection at a later August 2025 hearing at which Mother was present. The court also ordered a new referral for reunification services.

¶10           In September 2025, Mother began communicating with DCS again. She had one successful parental visit, canceled two visits last minute, and on two occasions the foster parent took Jayce home from school, claiming to be unaware of a scheduled visit. For the following three weeks, Mother did not respond to DCS's calls and emails.

¶11 The juvenile court held a contested termination hearing in December 2025. Mother testified that she had stable housing and worked as a full-time, live-in caretaker. Mother also admitted she did not have contact with Jayce from June 2021 to September 2024. She explained that Jayce's father never told her he had returned Jayce to DCS custody and instead told her Jayce was in the room with him when she called on the phone. During that time, she never visited because the father lived over an hour away and she did not have transportation. Mother testified that she began participating in reunification services in September 2024, as soon as she found out through an estranged family member that Jayce was in DCS care. She also had consistent issues with changing DCS case managers and was not aware of attempts to contact her.

¶12 Mother testified she was now aware that DCS was unable to get in touch with her for the six months between February and September 2025 but asserted that there was more case manager turnover during that time. Lastly, Mother admitted that she had not asked for any additional services, even though she wanted to learn more about Jayce's condition and participate in medical and counseling appointments.

¶13 The current DCS case manager testified that Jayce had been in out-of-home care for almost four years, that there was no evidence Mother provided financial support, gifts, or letters to Jayce since the start of reunification services, that Mother never responded to her emails—which she copied Mother's counsel on—and she could not leave Mother a voicemail because her inbox was full. Next, the case manager testified that she believed Jayce's high needs contributed to Mother's inability to maintain a parental relationship and that Mother abandoned Jayce by failing to maintain contact since Jayce had been in care. The case manager also testified that the maternal aunt was willing to adopt, and even if she was unable to, Jayce was adoptable and would benefit from leaving the foster care system. Lastly, the case manager acknowledged that the frequent case manager turnover made it harder for parents to meet DCS requirements for reunification.

¶14 In January 2026, the court terminated Mother's parental rights on abandonment and 15 months out-of-home placement grounds. On abandonment, the court found Mother had failed to see Jayce for 30 months and failed to participate in reunification services after she reconnected with DCS. The court also found that Jayce had been in care for more than 15 months, DCS had made diligent efforts to provide an array of reunification services, and that reunification would have likely occurred had Mother completed them. And the court concluded termination was in Jayce's best

interests, finding that Jayce was adoptable, there was a potential adoptive placement, and termination would benefit Jayce by allowing the adoption to proceed. Mother timely appealed. We have jurisdiction. A.R.S. §§ 8-235(A), 12-120.21(A)(1), and -2101(A)(1).

## DISCUSSION

**¶15**        Parents have a fundamental, but not absolute, liberty interest in the care, custody, and management of their children. *Brionna J. v. Dep't of Child Safety*, 255 Ariz. 471, 476, ¶ 18 (2023). A court may terminate parental rights under certain circumstances but must provide the parent with due process. *Id.* Due process requires the court to find the parent unfit as a matter of law, *id.* at 477, ¶ 19, and such parental unfitness is demonstrated by a finding of one of the substantive grounds under Arizona Revised Statutes Section 8-533(B), *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 150, ¶ 9 (2018). The court must find such grounds by clear and convincing evidence, and by a preponderance of the evidence that termination is in the child's best interests. *Brionna J.*, 255 Ariz. at 477, ¶ 20. We accept the court's factual findings if supported by reasonable evidence and inferences and affirm the court's legal conclusions on the statutory termination ground unless clearly erroneous. *Id.* at 478–79, ¶¶ 30–31.

**¶16**        On appeal, Mother only challenges the 15 months out-of-home placement ground and the best interests finding. By failing to challenge the abandonment ground, Mother has waived any argument the court erred in granting termination on that basis. *Crystal E. v. Dep't of Child Safety*, 241 Ariz. 576, 577–78, ¶ 5 (App. 2017). But waiver is a discretionary doctrine, and "a child's best interests trump the consequences ordinarily imposed" by waiver. *Nold v. Nold*, 232 Ariz. 270, 273, ¶ 10 (App. 2013). In this case, even assuming error in the court's 15-months finding, any relief would be of no effect, so long as the court's abandonment finding was proper. Therefore, we exercise our discretion to consider whether abandonment was supported by clear and convincing evidence. *See Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 3 (App. 2002).

### 1. Abandonment

**¶17**        Abandonment is a parent's failure to "provide reasonable support and to maintain regular contact with the child, including providing normal supervision." A.R.S. §§ 8-531(A)(1), -533(B)(1). Failing to maintain a "normal parental relationship" with the child for six months without "just cause" is "prima facie evidence of abandonment." A.R.S. § 8-531(A)(1). The court considers a parent's objective conduct, not her subjective intent.

*Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 249–50, ¶ 18 (2000). The burden is on the parent to "act persistently to establish the relationship however possible and vigorously assert her legal rights to the extent necessary." *Id.* at 250, ¶ 22 (cleaned up). In other words, a parent's actual conduct trumps her words or intent.

**¶18**          At the hearing, Mother admitted that she had gone about 30 months without seeing Jayce between 2021 and 2024, and that she was unaware that DCS was trying to reach her to schedule parenting visitation for the six-month period between February and September 2025. But the record established that DCS attempted to contact her all along through phone calls, social media, and at her suspected addresses. The 30-month period alone is prima facie evidence of abandonment, and Mother has not shown she made even minimal efforts to provide reasonable support or maintain regular contact with Jayce during that period.

**¶19**          Mother testified (1) the father misled her to believe Jayce remained in his custody and was present when she would call over the phone, (2) she did not have means of transportation to reach the father's home over an hour away, and (3) she agreed not to seek relief in court when he would allegedly fail to meet her for agreed-upon parental visitations. This is not sufficient to establish that the father interfered, preventing a conclusion of abandonment, or that Mother showed statutory "just cause" for her abandonment.

**¶20**          In *Calvin B. v. Brittany B.*, we held the record did not support abandonment when a mother substantially interfered with the father's ability to visit with child, but the father consistently and actively sought such visitation. 232 Ariz. 292, 296–298, ¶¶ 21–27 (App. 2013). Here, the record does not establish that Mother vigorously asserted her rights by making any effort to contact Jayce between 2021 and 2024. Mother did not claim to have attempted video calls or made other active efforts to confirm the presence and well-being of her child, nor did she attempt to communicate directly with Jayce at all. Once Mother came in contact with DCS, she did not keep the agency up to date with her current information. She offered no evidence of seeking her own transportation once she had stable income and housing.

**¶21**          Mother faced significant barriers to staying in touch with Jayce. But her objective conduct was not sufficient to overcome abandonment as a matter of law. *Michael J.*, 196 Ariz. at 249–50, ¶ 18; *In re B.W.*, 260 Ariz. 123, 131, ¶ 24 (2025) ("[P]arents have 'just cause' when they

had a reasonable and fair justification for not maintaining a normal parental relationship with the child and relied on that justification in good faith.").

¶22 Mother is not the only actor who made missteps. On some occasions, the foster parent prevented Mother's parental visitation by refusing to bring Jayce and claiming not to be aware of the scheduled visitation because "she doesn't read texts." Indeed, on one occasion, Mother was left in tears after she had traveled on her scooter all the way to the DCS office to see Jayce. DCS's engagement with this case was troubling in several ways. Most notable, over a dozen case managers handled Mother's case, at least four in the year between Mother reaching out to DCS and the termination. And the DCS case manager who testified acknowledged that DCS records are incomplete due to case manager turnover preventing access to text messages and emails previously sent in this case. One of the DCS service providers also made an error that directly impacted Mother's visitation time: her case aide's failure to save a reminder to extend the reunification services referral expiring in February 2025 resulted in its closure and termination of all visitation scheduling. But others' missteps do not justify Mother's failure to "provide reasonable support and to maintain regular contact with the child," which establishes abandonment as a matter of law. A.R.S. § 8-531(A)(1).

¶23 In considering Mother's objective conduct, we acknowledge that after connecting with DCS, she successfully completed some of the reunification services, participated in some parental visits with Jayce, and made commendable strides in engagement. Nothing in the statutory text, however, suggests a parent's subsequent conduct can undo an abandonment that already occurred. And Mother did not challenge the abandonment conclusion on appeal. Under different facts, a parent's post-abandonment consistent reunification conduct could establish that termination is not in the child's best interests, notwithstanding prior abandonment. *See In re M.L.*, 261 Ariz. 189, 197, ¶ 41 (App. 2025) (in deciding best interests, "the court must consider evidence about the current nature of the parent-child relationship, including any steps a parent has taken to re-establish a parent-child relationship or to remove roadblocks preventing such a relationship."). That is not this case.

¶24 Reasonable evidence exists on this record to support the court's abandonment finding. There is no clear error here.

## 2. Best Interests

**¶25** The juvenile court considers the totality of the circumstances existing at the time of severance when evaluating best interests. *Alma S.*, 245 Ariz. at 150–51, ¶ 13. "Termination is in the child's best interests if either: (1) the child will benefit from severance; or (2) the child will be harmed if severance is denied." *Id.* A prospective adoption is a benefit that supports the best interests finding. *Demetrius L.*, 239 Ariz. at 4–5, ¶ 16. Adoptability is based on the likelihood that a child will be adopted, not the possibility they could be adopted. *Titus S. v. Dep't of Child Safety*, 244 Ariz. 365, 370–71, ¶ 22 (App. 2018).

**¶26** Mother claims the court erred by finding termination was in Jayce's best interests. She claims the record demonstrates the existence of her loving relationship and bond with Jayce despite not seeing each other for a long time. She argues DCS knew Jayce was not adoptable, so it discussed guardianship options and failed to provide the court with relevant records of Jayce's severe needs and services. Mother essentially asks us to reweigh the evidence presented to the juvenile court, which we do not do. *Wright v. Farris,* 259 Ariz. 149, 152, ¶ 16 (App. 2025).

**¶27** A parent's bond with her child is a factor, but not a dispositive one. *Dominique M. v. Dep't of Child Safety*, 240 Ariz. 96, 98–99, ¶ 12 (App. 2016). The court acknowledged Mother's connection with Jayce but found that abandoning Jayce for almost three years countered the weight of such bond. The DCS case manager testified that Jayce was adoptable despite the severe disability, was thriving in foster care, and was seeing improvements in behavior and life skills development. The record also supported that Jayce's maternal aunt—the potential adoptive placement—had extensive experience with special needs children. This evidence supported the court's finding that the current placement meets Jayce's needs, Jayce is adoptable, and termination would benefit Jayce by allowing the adoption to proceed. And it is clear the juvenile court considered the totality of the circumstances based on the evidence presented.

**¶28** On this record, the court did not abuse its discretion when it found that termination was in Jayce's best interests.

## CONCLUSION

¶29      We affirm.



MATTHEW J. MARTIN • Clerk of the Court
**FILED**:      JR